**SCHNAPPS SHOP, INC.**

**v.**

**H. W. WRIGHT & CO., LTD.**

**SCHNAPPS SHOP, INC.**

**v.**

**UNIVERSAL LIQUORS, INCORPO-RATED.**

Civ. Nos. 20686–K, 70–223–K.

United States District Court,
D. Maryland.

Dec. 28, 1973.

Clarence W. Sharp and Gilbert Rosenthal, Baltimore, Md., for plaintiff.

Michael J. Schwarz, Baltimore, for defendant Universal Liquors, Inc.

Norman R. Lilly and Merrill & Lilly, P. A., Annapolis, Md., for defendant H. W. Wright & Co. Ltd.

FRANK A. KAUFMAN, District Judge.

In these two cases [1] the Schnapps Shop, Inc. (Schnapps), a Maryland corporation engaged in the retail liquor business, has instituted private antitrust actions against H. W. Wright & Co., Ltd. (Wright) and Universal Liquors, Inc. (Universal), also Maryland corporations, both wholesale distributors of alcoholic beverages to Maryland retail liquor outlets. Schnapps, seeking relief under Sherman § 1 [2] and Clayton § 4,[3] claims each defendant separately conspired with other Maryland retailers, or alternatively with plaintiff, to fix retail liquor prices; and that when Schnapps refused to abide by defendants' respec-

---

1. On April 22, 1969 Schnapps Shop, Inc. filed private antitrust suits in this Court against Bond Distributing Co. (Bond), a Maryland corporation, and H. W. Wright & Co., Ltd. Then on February 25, 1970, Schnapps sued Universal Liquors, Inc. Although each suit alleged a separate antitrust violation, and no allegations were made of any conspiracy among the three defendants, the cases, because they involved similar questions of law and substantially similar ultimate factual questions (*see* Federal Civil Rule 42(a)), were pre-

tried jointly and calendared for successive nonjury trials as to issues of liability only. The damage issues were bifurcated and reserved for later trial under Federal Civil Rule 42(b). Just before trial the Bond case was settled. By agreement of counsel in the Wright and Universal cases, evidence in those two cases was considered evidence in each.

2. 15 U.S.C. § 1.

3. 15 U.S.C. § 15.

tive price policies, Wright and Universal thereafter refused to deal with Schnapps.[4] Under the facts in each of these two cases Schnapps is entitled to recover if the defendant entered into a conspiracy with regard to prices and thereafter pursuant to that conspiracy refused to deal with Schnapps.

### Jurisdiction

At the outset both defendants contest this Court's jurisdiction, contending that the alleged violations by defendants of the federal antitrust laws did not constitute restraint of interstate commerce. At the time Schnapps opened its retail outlet on May 27, 1967, Schnapps was one of at least 4000 Maryland liquor retailers. From May, 1967 to November, 1969, Schnapps purchased $25,152.67 of alcoholic beverages from Universal. Between May 22, 1967 and October, 1968, Schnapps purchased $21,721.43 of alcohol from Wright. In 1969 Universal sold 168,943.04 gallons of alcohol, of which 714 were sold to Schnapps. Wright sold 1,077.89 gallons to Schnapps between May, 1967 and October, 1968.

■ Universal is the sole Maryland distributor for Publicker Industries, Dennis and Huppert and Double Springs Distillery, and handles some 100 brands of whiskeys and wines, including Charter Oak, Inver House, Howar's, Philadelphia, Embassy Club and Haller's. In 1969 Universal's sales represented 2.21% of all liquor sold by Maryland distributors. Wright is the sole Maryland distributor for Hiram Walker, W. A. Taylor, Widmer Wines and some brands of Paterno Imports, including, among others, Canadian Club, Walker's Canadian, Imperial, John Jameson, Meadowbrook, Thorne's, Old Smuggler, Sandeman, Walker's Deluxe, Ten High, Private Cellar, Hiram Walker's Vodka, House of Lords Gin, Booth's Gin, Maraca Rum, Courvoisier, Drambuie, Tia Maria, and Cherry Heering. In 1969 Wright's

share of the Maryland market amounted to approximately 8.09%. Both defendants purchase all of the spirits they wholesale to Maryland retailers from distillers and producers located outside Maryland, and sell them within Maryland. Schnapps is but one small liquor retailer among many. Thus, any refusal of either defendant to deal with plaintiff affected only a negligible portion of the total liquor moving into Maryland and affected only a small portion of the liquor being handled by defendants. Further, plaintiff's purchases of Charter Oak—the brand giving rise to Universal's alleged refusal to deal—amounted to less than one percent of all Charter Oak Bourbon marketed in Maryland that year. But even so, there is in these cases no lack of sufficient effect upon interstate commerce.

■ In assessing that effect, it must first be determined whether the activities complained of were either "in commerce" or "intrastate but substantially affected interstate commerce". Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732, 739 n.3 (9th Cir.), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954). If the activities fell within either class, then a qualitative test—whether the activities are of the kind restricting interstate commerce—is applicable. The amount of interstate commerce so affected need not be shown. United States v. Yellow Cab Co., 332 U.S. 218, 225–226, 67 S.Ct. 1560, 91 L.Ed. 2010 (1946); Las Vegas Merchant Plumbers Ass'n v. United States, *supra.*

In Burke v. Ford, 389 U.S. 320, 88 S. Ct. 443, 19 L.Ed.2d 554 (1967), the Court, faced with market factors substantially similar to those present in this case, held that even if defendants were in intrastate commerce, their activities affected interstate commerce. Wright's and Universal's wholesaling activities are within the flow of interstate commerce,

---

4. Schnapps and Wright, however, resumed business dealings with one another in December, 1972, and have since continued to transact business. Schnapps and Universal have done no business with each other since the alleged cut-off date.

even though interstate movement terminates when defendants have purchased the products they distribute. Since defendants are exclusive Maryland distributors for the products they handle, they are each essential conduits for the flow of those goods from outside of Maryland to the Maryland retail market. Further, even if defendants' sales are deemed wholly local, nevertheless they affect interstate commerce since the exclusive distribution feature means that each and every local sale which defendants do not make to a retailer such as Schnapps reduces—on a one-to-one basis—the volume moving into Maryland.

■ In Burke v. Ford, the Court rejected the lower court's holding that proof of market division was not—in and of itself—enough to show commerce affected. The within cases involve price-fixing rather than market division, but price-fixing is of course also an activity of the kind that restrains interstate commerce. United States v. General Motors, 384 U.S. 127, 146–148, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).[5]

### Reliability and Credibility

The evidence in both of these cases is conflicting and rife with problems of credibility and reliability. In both cases, the testimony of Douglas, the chief executive and owner of Schnapps, must be judged in the light of his assertions throughout discovery of the unavailability of various documents, followed by subsequent appearances of individual documents, and also in the light of his changes or elaborations of earlier factual statements, both during pre-trial and trial. The testimony of certain of the other witnesses, such as the wife of Douglas and the two top officials of Wright and Universal who testified, that is, Wareheim and Feldman, also raises substantial problems of credibility and reliability. It is in that context that the presence or absence of conspiracy and refusal to deal must be factually determined.

### Conspiracy

### A. Wright

Wright published in the Maryland Beverage Journal monthly suggested resale prices for all of its alcoholic beverages marketed to Maryland retailers. Wright discouraged retailers from advertising any products handled by Wright below those recommended prices, throughout the period at issue until the middle of 1970. Whenever a retailer advertised a Wright product below the suggested price, between three and ten

---

5. The Supreme Court's discussion in Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 229–235, 68 S.Ct. 996, 92 L.Ed. 1328 (1948), raises the question of whether the scope of the interstate commerce element of the Sherman Act is fully as broad as the interstate power of Congress as outlined in Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Thus, only the most local of transactions have been held outside the Sherman Act's reach. See, e. g., Northern California Monument Dealers Ass'n v. Interment Ass'n of California, 120 F.Supp. 93 (D.Cal.1954) (alleged Sherman § 1 and Clayton § 2 violations in the retail sales of gravestones not within interstate commerce clause). But cf. Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969) (reversing district court per curiam and specifying actions form which conspiracy could be inferred in a fact situation facially similar to that in Monu-

ment Dealers, supra, but not commenting upon the interstate commerce point) ; Monument Bowl, Inc. v. Northern California Bowling Proprietors' Ass'n, 197 F.Supp. 208 (N.D. Cal.1961) (charge that operator of bowling establishment lost customers as a result of defendants' conduct not illegal restraint of trade, but at most local restraint affecting local commerce). Tobman v. Cottage Woodcraft Shop, 194 F.Supp. 83 (S.D.Cal.1961), relied upon by defendants in the within case, holds (at 88) : "The fact that articles which are the subject of price-fixing agreements have previously moved in interstate commerce, does not by itself establish the requisite adverse effect upon interstate commerce"; and also holds that further facts must be shown. Even if that is the test, but see Burke v. Ford, supra, there exist in this case "further facts". See the discussion in the body of this opinion, infra.

competing retailers complained to Wright. Someone from Wright then called or visited the retailer to try to dissuade him from continuing such advertisements.[6] Wareheim, defendant's executive vice-president, testified that on those occasions Wright only requested adherence to its policy, that it never threatened, coerced, or mentioned any possibility of ceasing dealings, and that Wright's efforts to persuade probably included mention of the willingness of other retailers to honor Wright's policy.

Those tactics of Wright have apparently been successful. Of the approximately four thousand retailers serviced by Wright, only five or ten advertised below suggested resale prices in 1968. Visits to the few dissidents were more often fruitful than not; Wareheim estimates that a majority—somewhere between fifty-one and seventy-five percent —of the offending retailers agreed to abide by Wright's advertising policy.

### B. *Universal*

Although Douglas testified to the contrary, Universal published suggested retail prices in the Maryland Beverage Journal. For the purpose of determining what he called "the cut-raters", Feldman, Universal's sales manager, regularly checked liquor advertisements in the Baltimore newspapers for advertised retail prices of Universal's products. In addition, whenever Feldman visited a retail outlet, he looked at the various prices posted within the store. He denied, however, ever receiving any phone call from any retailer complaining of advertising by competitors below suggested resale prices. Feldman and another Universal official who testified at trial also denied ever calling any retailer other than Schnapps—on their own or at the instigation of any other customers —to complain of an advertised price.

Plaintiff offered no testimony that Universal's policy was other than as Universal's officials stated. Nor was there any testimony that any of Universal's products were advertised below cost by any retailer other than Schnapps. Further, there was no evidence that retailers with whom Universal dealt generally maintained a uniform price advertising policy and that if there were violations, other retail customers contacted Universal and Universal then contacted the violators. Thus, there are substantial differences between the testimony in the Wright case and in the Universal case.

With respect to Schnapps itself, Feldman of Universal stated he once saw a Schnapps advertisement for "4 yr. old Bourbon, $1.99", which Feldman believes was Haller's Deluxe, a brand handled by Universal, but that he (Feldman) did nothing since it was a "blind" ad. Douglas of Schnapps testified that Schnapps had once advertised Inver House Scotch, handled by Wright, below suggested resale price, and as a result received a call from Feldman requesting that Schnapps stop the advertisement. Douglas further testified that he agreed to Feldman's suggestion. Douglas, however, did not introduce any invoice showing that he had ever purchased Inver House from defendant, nor any copies of any Schnapps Shop advertisements for that product. Plaintiff could have corroborated his testimony with regard to the Inver House incident, but failed so to do. In view of the doubts which it has as to Douglas' credibility and reliability, this Court does not accept Douglas' uncorroborated assertion that the Inver House incident occurred. This Court, however, does find—despite Feldman's testimony to the contrary—that on *some* occasion either Feldman or another Universal employee called or visited Douglas to complain of a Schnapps

---

6. In his deposition, Wareheim stated:

Q * * * [Y]ou only reacted to complaints of advertised prices from other retailers?

A That's right.

Although Wareheim (of Wright) testified at trial that he made the calls to offending retailers regardless of phone calls from other retailers, this Court finds that Wareheim's initial statement is the correct one.

advertisement. The parties, before trial, agreed:

> That on occasion, prior to December 15, 1969, repersentatives of the Defendant requested that the Plaintiff not sell Defendant's merchandise at outrageously low prices or at prices below Plaintiff's cost. That on such occasion the Defendant did not set or fix, or attempt to set or fix, any retail price to be charged by the Plaintiff, and that all such discussions related only to advertising price.

This Court does not find, however, that on those occasions Schnapps agreed to withdraw any advertisements or otherwise change its policy.

Each defendant contends that the facts of each case are insufficient to make out a conspiracy in violation of the antitrust laws. "The crucial question is whether [the] conduct [of Wright and/or Universal] toward [Schnapps] stemmed from independent decision or from an agreement tacit or express." Theatre Enterprises v. Paramount Distributing Corp., 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). In the Wright case, defendant's actions clearly partook of the latter; in Universal plaintiff has not borne the burden of proving by a preponderance of the evidence that Universal's conduct resulted from agreement with any third party or with plaintiff, or from other than Universal's own independent decision.

■ Universal may have contemplated concerted action. For example, Feldman's reading of advertisements and his checking of posted prices might well have been preliminaries to solicitation of agreements by retailers to maintain a united advertised-price front. In that connection, the fact that Universal requested Schnapps "not sell Defendant's [Universal's] merchandise at outrageously low prices or at prices below Plaintiff's cost",[7] further suggests that Universal may have invited concerted action, at least with respect to plaintiff himself. But with the possible excep-

tion of the Inver House incident discussed *supra,* there is no evidence of acceptance by anyone of such an invitation. Without the crucial steps of invitation *and* acceptance, no conspiracy in violation of Sherman § 1 exists, and plaintiff's claim fails. Although the Supreme Court on one occasion reserved the question of whether a particular unilateral refusal to deal would constitute a violation of the antitrust laws, *see* United States v. General Motors, 384 U.S. 127, 144 n. 18, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), the Court has yet to overrule the doctrine of United States v. Colgate, 250 U.S. 300, 39 S.Ct. 465, 63 L. Ed. 992 (1919), and to discard the requirement that the proof of conspiracy is a prerequisite to a violation of Sherman § 1. Klein v. American Luggage Works, 323 F.2d 787 (3d Cir. 1963). Thus, plaintiff has not proven his case against Universal.

■ Wright is another matter. That only five or ten of Wright's 4000 customers advertised below suggested retail price in 1968 and that all of the other customers did not do so does not compel an inference of conspiracy. *See* United States v. National Malleable & Steel Casings Co., 358 U.S. 38, 79 S.Ct. 39, 3 L.Ed.2d 44 (1959), aff'g 1957 Trade Cas. ¶ 68,890 (N.D.Ohio 1957); Theatre Enterprises v. Paramount Distributing Corp., *supra,* at 540–541. But such evidence when considered in tandem with additional facts, however, can suffice to establish conspiracy. *See, e.g.,* United States v. General Motors, 384 U.S. 127, 140–141, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Pittsburgh Plate Glass Co. v. United States, 260 F.2d 397, 400–401 (4th Cir.), aff'd, 360 U.S. 395, 79 S.Ct. 1237, 3 L. Ed.2d 1323 (1959). Such additional facts are present in the Wright case. For Wright followed up, after receiving complaints from other retailers, by getting in touch with the offending retailer —a course of action which amounted to a tacit agreement to police retailers who

---

7.  *See* the indented quotation at p. 576 *supra.*

violated the advertised-price line. United States v. General Motors, *supra*. Also, Wright sought and won agreement from some offending retailers to hold the line in the future. Such conduct by itself would seem to amount to conspiracy. Albrecht v. Herald Co., 390 U.S. 145, 150, n. 6, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); United States v. Parke, Davis & Co., 362 U.S. 29, 45–47, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

■■ Wright contends that since it never menaced retailers with economic sanctions or with refusals to deal, no conspiracy existed. But while threats of cut-off to enforce a price policy runs afoul of the antitrust laws, Simpson v. Union Oil Co., 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), the presence of such tactics is not required to establish a Sherman § 1 violation. When a distributor goes beyond mere unilateral refusal to deal, and secures—by any means—agreement from retailers to comply with that policy, such distributor has gone beyond the precarious safety area established by *Colgate*. Nor does it matter that any such agreement was motivated by sound business self-interest rather than by coercion. United States v. General Motors, *supra* at 142.

### Refusals to Deal

#### A. *Wright*

■ On September 13, 1968, Schnapps advertised in the Evening Sun, two full quarts of Hiram Walker's Imperial Whiskey for $7.99. The advertisement included the statement: "Save $2.-59—Reg. $10.58 Val." That latter figure was Wright's suggested resale price. The Hiram Walker's whiskey so advertised had been purchased by Schnapps from Wright for $4.05 per quart; $8.10 for two quarts. Schnapps had also bought from Wright half-gallon bottles

of Hiram Walker's Imperial for $7.49 per bottle.

On Saturday, September 14, 1968, Wareheim of Wright, accompanied by his six-year old daughter, visited Schnapps Shop.[8] He talked with Douglas and requested Douglas to refrain from further advertising Hiram Walker's at the $7.99 price. According to Douglas, Wareheim added that Wright was getting phone calls from other retailers complaining about the advertisement. Wareheim maintains that he did not care what price Douglas sold at within the store, but only objected to the advertised price. On cross-examination Douglas agreed with that testimony by Wareheim, but added that Wareheim had also expressed puzzlement that Douglas could sell Hiram Walker's at such a low price.

Douglas and Wareheim completely disagree about what followed. According to Wareheim there was virtually no response by Douglas other than Douglas' refusal to say whether he would or would not comply with Wareheim's request. According to Douglas, he told Wareheim he would not retract, whereupon Wareheim left, advising Douglas that Wright was not going to ship to Schnapps and that Schnapps should go ahead and advertise.

After the September 13, 1968 advertisement, Schnapps placed two further orders with Wright, which orders were filled on September 20 and September 26. On September 27, Schnapps again ran the Hiram Walker advertisement. Thereafter, until December, 1972, plaintiff and Wright had no further business dealings. Wright maintains that it continued to be willing to do business; that it did not refuse to deal with Schnapps; that Wright's route salesman solicited unsuccessfully three or more times at Schnapps after September 27 in at-

8. Douglas testified at trial that Moffett, Wright's sales manager, also visited Schnapps to complain about the advertisement. Douglas was unsure of the date, and unforthcoming about the nature of the visit, except to state that Moffett, like Wareheim, informed him he could not run such advertisements. Defendants did not call Moffett to the stand, and in light of this Court's findings concerning the Wareheim visit, it is unnecessary to make any findings concerning the alleged Moffett visit.

tempting to obtain orders; that thereafter such salesman was instructed by one of his superiors at Wright that he did not need to continue visiting Schnapps; but that such salesman may have made occasional stops thereafter. In any event, Wright contends that no Wright official ever told any Wright employee to cease doing business with Douglas.

Douglas testified that after September 14 no Wright salesman made any more stops at Schnapps; that some weeks after September 14, he saw the Wright route salesman on the street and asked why such salesman had not been stopping at Schnapps and that the salesman purportedly replied that he had orders not to go near Schnapps "with a ten-foot pole".

On October 17, 1968, Douglas mailed an order to Wright, return receipt requested. That order was received the following day, and signed for by one of Wright's warehouse employees. The evidence includes not only the registered mail receipt, but also a carbon copy of the order. A few days before mailing that order, Douglas testified that he had called it in by phone. Wright never filled the order. Douglas states that he placed no follow-up order, even though he had placed follow-up orders on other previous occasions when Wright had misplaced an order, and that he did not so follow up in October, 1968 because he "knew why" the order had not been filled.

Wright receives approximately 800 phoned orders a week, and approximately six mailed orders. Pursuant to normal procedure, a warehouseman picks up the mail and gives it to office personnel who, if any of the mail contains orders, turn the same over either to the order department or for IBM processing. Wareheim, Wright's executive vice-president, stated that he does not usually see such orders.

This Court finds that after Schnapps ran the second advertisement on September 27, Wright refused to deal with plaintiff. Wright could have called to the witness stand the route salesman who handled the Schnapps account, to substantiate its claim that such salesman continued to visit Schnapps. However, Wright did not call that witness even though he was available. Further, Wright provided no satisfactory answer for its failure to fill the written order of October 16. The Court further finds that the order was received by Wright and that Wright's refusal to deal was motivated by plaintiff's further advertisement of Hiram Walker's Imperial Whiskey below Wright's suggested resale price after Feldman's visit to the Schnapps store on September 14, 1968.

### B. *Universal*

On December 15, 1969, Schnapps advertised Charter Oak Bourbon, a product distributed by Universal, in the Evening Sun at $2.99 per fifth. Plaintiff had paid to Universal $3.05 per fifth; Universal's suggested retail price was $3.99. Feldman testified that he called Douglas on the evening of December 15 to complain about the advertisement, asked Douglas to retract his advertisement, and offered to pay for the retraction, that he (Feldman) further added that Douglas' advertisement would get Universal in trouble with an important customer of Universal; and that Douglas agreed to the retraction.

Feldman testified he was concerned about the advertisement because the important customer had been advertising Charter Oak for $3.69 for quite some time, and that if Schnapps continued so to advertise, that important customer and other retailer customers of Universal might have concluded that they could not meet the price competition and might have cancelled further orders of Charter Oak. Feldman also testified that he did not receive any call from that major customer. Douglas testified that Feldman did not call him on the telephone during the evening of December 15 and that the telephone conversation concerning which Feldman testified did not occur.

On December 16, according to Feldman, he went to Schnapps Shop in the

company of the Universal route sales-man who handled the Schnapps account, in order further to discuss retraction. Present at that time, according to Feld-man, were Feldman, Universal's sales-man, Douglas, Douglas' wife, and two salesmen for other concerns. Feldman testified he (Feldman) inquired about the pending retraction but that Douglas suggested an obscene alternative course of action for Feldman and his merchan-dise and indicated that Schnapps would not retract. Further, according to Feld-man, Douglas then suggested that Uni-versal could cease doing business with Schnapps if Universal did not like the advertisement, and that Feldman there and then accepted that offer. According to Douglas, Feldman, like Wareheim on September 14, said as he walked out of the Schnapps store, that he would not "ship" Schnapps anymore.

█ Although Feldman, Douglas and Douglas' wife all gave slightly dif-fering versions as to who was present and what was said on December 16, none of those versions suggest that Feldman talked with Universal's important cus-tomer, or any customer other than Schnapps, about the Schnapps December 15 advertisement. Without such evi-dence, there is no basis for any finding of conspiracy between Universal and any customer other than Schnapps. Klein v. American Luggage Works, *supra*.

█ If Feldman's testimony as to the telephone agreement between Doug-las and Feldman on the evening of De-cember 15, *i. e.*, to retract the advertise-ment, is believed—and this Court does accept Feldman's testimony as to that telephone conversation—it comes peril-ously close to conspiracy. In Albrecht v. Herald, 390 U.S. *supra* at 150 n. 6, the Court stated: "Petitioner's original complaint broadly asserted an illegal combination under § 1 of the Sherman Act. Under *Parke, Davis* petitioner could have claimed a combination between respondent and himself, at least as of the day he unwillingly com-plied with respondent's advertised price."

In this case, Schnapps never complied; rather, Douglas of Schnapps changed his mind about the retraction. In Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939), the Court said: "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their ad-herence to the scheme *and participated in it.*" (Emphasis added.) In this case there was no meaningful *participation*. Even accepting Feldman's testimony, plaintiff at most came to the brink by agreeing on the evening of December 15, but retreated by the following morning. Thus, there was no more than a verbal consent, unacted upon, and soon retract-ed. In order for plaintiff to prevail in a civil antitrust action, plaintiff must es-tablish that there was an overt act in pursuance of the conspiratorial scheme and in furtherance of the conspiracy. Neff v. World Publishing Co., 349 F.2d 235, 257 (8th Cir. 1965). Here, there was no such act. It would indeed be ironical if Feldman's version of the tele-phone conversation on December 15—a conversation Douglas says never oc-curred—were to provide Schnapps with the necessary underlying conspiratorial agreement which Schnapps must prove in order to prevail against Universal. It is true that under *Colgate* a plaintiff who refuses to throw in with a distribu-tor has no cause of action, as a result of such refusal, under the antitrust laws, whereas a plaintiff who combines in vio-lation of law with the distributor may establish as the conspiratorial agreement his own agreement with the defendant. However, in this case, as indicated above, the brief moment of telephone agreement—if Feldman is believed—was never implemented and evaporated too quickly to constitute a conspiracy.

On December 18, 1969, according to Douglas, he called in an order for Schnapps which order was never filled, and also addressed a communication, by registered mail, which was accepted by Feldman on December 30, 1969. The post-dispute order in the Wright case

was introduced into evidence. In the Universal case no copy of the alleged post-dispute order was available; Douglas testified Schnapps' carbon copy had been lost. In a pre-trial deposition, Feldman acknowledged receipt of a registered mail letter containing a reiteration by Douglas that Douglas would engage in no further dealings with Universal, whereas at trial Feldman testified that he did not recall receiving any such letter and could not recall its contents. This Court finds that Douglas' letter contained an order, that Universal knew of that order, and that Universal refused to fill it.

Douglas testified that he attempted to renew dealings with Universal in December, 1972, but that his orders were not filled. Feldman testified that Universal received no such orders and that if Universal had received any such order, Universal would have filled it. This Court, however, finds that Douglas did attempt to resume dealings and was rebuffed. This Court further finds Feldman's decision on December 16 not to deal further with Douglas was initially an acceptance of Douglas' vituperative offer to cease dealing with Universal which Feldman promptly accepted. Thereafter, it may well be that Universal's belief that Douglas would continue to advertise at prices below Universal's suggested resale prices caused Universal to be unwilling to do further business with Schnapps, and that Universal might have completely ignored Douglas' abrasive remarks on December 16 and have renewed selling to Schnapps but for the advertising-below-suggested-resale-price problem. But, even if Universal did refuse to resume dealings with Schnapps because of the price problem and even if Universal impliedly communicated to Schnapps that reason as the sole reason for such refusal to resume dealings, Schnapps has not in this case

proven any conspiratorial agreement between Universal and Schnapps or Universal and anyone else to cease advertising at prices below Universal's suggested resale price.

### Other Issues [9]

■ Because they only sought to affect advertised prices, and not retailers' in-store prices, both defendants contend that they did not run afoul of Sherman § 1. Defendants cite no cases to support that distinction, and with good reason, for the argument is misconceived. In United States v. Parke, Davis & Co., 362 U.S. 29, 46–47, 80 S.Ct. 503, 513, 4 L. Ed.2d 505 (1960), any attempt to restrict retailers' advertising was among the actions which the Court held violative of the Sherman Act, when it wrote:

> Moreover, Parke Davis also exceeded the "limited dispensation which [Colgate] confers," Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277, 1300, in another way, which demonstrates how far Parke Davis went beyond the limits of the Colgate doctrine. With regard to the retailers' suspension of advertising, Parke Davis did not rest with the simple announcement to the trade of its policy in that regard followed by a refusal to sell to the retailers who would not observe it. First it discussed the subject with Dart Drug. When Dart indicated willingness to go along the other retailers were approached and Dart's apparent willingness to cooperate was used as the lever to gain their acquiescence in the program. Having secured those acquiescences Parke Davis returned to Dart Drug with the report of that accomplishment. Not until all this was done was the advertising suspended and sales to all the retailers resumed. In this manner Parke Davis sought assurances of

---

9. Counsel for Wright and Universal have each raised a variety of defenses, all applicable to each case irrespective of which defendant raised them. In this Court's opinion, for the reasons set forth *infra* in the body of this opinion, none of those defenses are meritorious as to Wright *or* Universal. Thus, they are of no help to Wright, and would be of no help to Universal if Schnapps had proven a conspiracy in the Universal case.

compliance and got them, as well as the compliance itself. It was only by actively bringing about substantial unanimity among the competitors that Parke Davis was able to gain adherence to its policy. It must be admitted that a seller's announcement that he will not deal with customers who do not observe his policy may tend to engender confidence in each customer that if he complies his competitors will also. But if a manufacturer is unwilling to rely on individual self-interest to bring about general voluntary acquiescence which has the collateral effect of eliminating price competition, and takes affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid such price competition, the customers' acquiescence is not then a matter of individual free choice prompted alone by the desirability of the product. The product then comes packaged in a competition-free wrapping—a valuable feature in itself—by virtue of concerted action induced by the manufacturer. The manufacturer is thus the organizer of a price-maintenance combination or conspiracy in violation of the Sherman Act. Under that Act "competition not combination, should be the law of trade," National Cotton Oil Co. v. Texas, 197 U.S. 115, 129, 25 S.Ct. 379, 382, 49 L.Ed. 689, 694, and "a combination formed for the purpose, and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129, 1168. * * *

In these two cases, the inference is also irresistible that combining to prevent advertising below suggested resale price, or below any price, will have an impact on price competition. When a retailer is free to advertise at any price, he alerts his competitors and his customers and often obliges his competitors to advertise *and sell* at a price competitive with the advertised price. Indeed, as Feldman testified in Universal he was worried that Schnapps' low Charter Oak advertised price would require other Universal customers to compete with Schnapps' advertised price or cease stocking Charter Oak. Further, as Douglas testified, advertising a low price of one brand stimulated Schnapps' sales of that and other brands.

Defendants can find no comfort in arguing that preventing advertising at low prices has only an indirect effect on the prices themselves. See United States v. General Motors Corp., 384 U.S. 127, 147, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Simpson v. Union Oil Co., 377 U.S. 13, 16–22, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221–222, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). It is a basic tenet of antitrust law that any conspiracy which has an impact on the price structure is illegal. As Mr. Justice Douglas stated in Socony-Vacuum Oil, *supra* at 221:

* * * Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. * * *

Nor are the motives, of wholesalers who seek to establish and maintain a level of advertised pricing, material. It makes no difference if the wholesaler's purpose is sound business self-interest, United

States v. General Motors, *supra*; to put a ceiling on prices, Albrecht v. Herald, 390 U.S. *supra* at 151–153 (1968); Kiefer-Stewart v. Seagram & Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951); or has the effect of pushing prices downward, United States v. Container Corp. of America, 393 U.S. 333, 336–337, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

■ Defendants further argue that plaintiff cannot prevail unless he offers proof that defendants' respective actions caused public injury. When a plaintiff has shown a *per se* violation of the antitrust laws, such as price-fixing, no further proof of public injury is required. *See* Radiant Burners v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

■ Defendants also seek to bring their actions within the pale by arguing that Schnapps had violated the Maryland Unfair Sales Act, Md.Ann. Code Art. 83, § 111 *et seq.*, by selling at less than cost.[10] However, none of the actions by either Wright of Universal were caused by any sale by Schnapps below cost, if such a sale in fact occurred. Rather, a desire to prevent advertising below a suggested retail price by each of the defendants impelled each of them to act as they did. Further, even if either defendant harbored the belief that Schnapps was selling below cost and was, in so doing, violating Maryland law, and that such violation permitted a wholesaler to seek to gain the agreement of his retail customers not to advertise below cost, such belief would be no defense herein. In Fashion Originators' Guild of America v. FTC, 312 U.S. 457 at 468, 61 S.Ct. 703, 708, 85 L.Ed. 949 (1941), the Court wrote:

* * * Nor can the unlawful combination be justified upon the argument that systematic copying of dress designs is itself tortious, or should now be declared so by us. In the first place, whether or not given conduct is tortious is a question of state law, under our decision in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. In the second place, even if copying were an acknowledged tort under the law of every state, that situation would not justify petitioners in combining together to regulate and restrain interstate commerce in violation of Federal law. * * *

In Radiant Burners v. Peoples Gas Light & Coke Co., *supra,* defendants were members of an association which passed on the safety of various brands of gas burners, and supplied gas only to those brands to which the association awarded its certified seal of approval. Despite defendant's claimed good business reason, the Court found the existence of a conspiracy in restraint of trade. In United States v. General Motors, *supra,* General Motors combined with some of its franchisees to prevent other franchisees from reselling automobiles to discount houses. General Motors considered that practice a threat to its whole franchise contract system. The Court

---

10. At trial, there was considerable exploration of factual issues concerning plaintiff's alleged sales below cost. In Wright, defendant showed that Schnapps purchased quarts of Hiram Walker's Imperial Whiskey from defendant at $4.05 per bottle, or $8.10 for two quarts, and half-gallon bottles at $7.49. Thus, to the extent Schnapps sold two quart bottles rather than half-gallons at the advertised price of $7.99, it was selling below the price it paid for the liquor. In Universal, defendant showed that plaintiff had paid $3.05 per fifth of Charter Oak bourbon, which Schnapps then advertised at $2.99 per fifth. Douglas claims that Universal gives one free case of liquor with every twenty-five ordered, and that Feldman personally delivered to him one free case and then calculated on the back of an invoice Douglas' resulting cost at $2.83. Feldman, however, testified that he has, and had then, four disintegrated discs, and has not lifted a case of anything for years. Feldman further testified that the handwriting on the back of the invoice was not his own. The Court accepts Feldman's testimony and accordingly does not find that Universal delivered a free case of Charter Oak bourbon to defendant.

stated that regardless of the validity or legality of the franchise system and the possibility that some franchisees violated their contractual undertakings, General Motors could not conspire to refuse to deal with uncooperative franchisees.

> These factors do not justify the result reached. It is of no consequence, for purposes of determining whether there has been a combination or conspiracy under § 1 of the Sherman Act, that each party acted in its own lawful interest. Nor is it of consequence for this purpose whether the "location clause" and franchise system are lawful or economically desirable. * * * [*Id.* at 142.]

And again at 146:

> * * * [W]here businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct. [Citation omitted.] Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system for distributing automobiles, any more than by reference to the allegedly tortious conduct against which a combination or conspiracy may be directed —as in Fashion Originators' Guild of America, Inc. v. Federal Trade Comm'n * * *.

Further, even if Schnapps did in fact violate Maryland's Unfair Sales Act, and even if the field covered by that Act when interstate commerce is affected, is not preempted by the Sherman Act—issues which this Court need not and does not decide herein—nevertheless, the Maryland Unfair Sales Act contains no provision sheltering combinations or refusals to deal.[11] Rather, that Act (Md. Ann.Code Art. 83, § 113) provides that certain Maryland courts, upon the "complaint of any person claiming to be injured" may enjoin any offending "reatailer or wholesaler from the commission of any act prohibited by the provisions of this subheading." The Act in no way authorizes self-help, collective or otherwise, as a remedy.

Nor do Schnapps' alleged violations of the Maryland Act bar Schnapps from suing under the equitable doctrine of unclean hands. It is true that *Fashion Originators' Guild, supra,* and *General Motors, supra,* were public antitrust suits, and that while *Radiant Burners, supra,* did involve a private plaintiff and a defense based on reasonable business purpose, the defendant therein apparently made no allegations that plaintiff had acted unlawfully. But Kiefer-Stewart v. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), involved a plaintiff who had allegedly committed an unrelated antitrust violation. Making it clear that the doctrine of unclean hands has no place in the antitrust laws, the Supreme Court upheld (at 214) the trial judge's instruction to the jury that plaintiff's participation in another conspiracy, even if proved, would have no bearing on defendant's liability. Further, in Perma-Life Mufflers, Inc. v. In-

---

11. The contention that the Maryland Unfair Sales Act is within the Sherman Act exemption for Fair Trade laws lacks merit since even if the Maryland Act did fall within that exemption it does not authorize defendant's conspiracy. The Unfair Sales Act directs individual retailer compliance, and places no statutory duty or right upon either a distributor or a competing retailer to use self-help to police an offending retailer.

It should be noted that Wareheim also testified that Hiram Walker's Imperial Whiskey had been under a Fair Trade agreement for sixteen years pursuant to Maryland's Fair Trade Act, Md.Ann.Code Art. 83, §§ 102–110. Wareheim admitted, however, that the Fair Trade agreement had not been enforced during, and for some time prior to, the events in question. He also specifically disavowed any intention to enforce the Fair Trade agreement against Schnapps at the September 14, 1968 meeting. No questions arise, therefore, with respect to the possibility that Wright's actions, had they been pursuant to a Fair Trade agreement, would have been exempt from Sherman Act purview.

ternational Parts Corp., 392 U.S. 134, at 138–139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968), in considering the applicability of the doctrine "in pari delicto" in an antitrust case, the Court stated:

> * * * We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes. It was for this reason that we held in Kiefer-Stewart Co. v. Seagram & Sons, * * * that a plaintiff in an antitrust suit could not be barred from recovery by proof that he had engaged in an unrelated conspiracy to commit some other antitrust violation. * * * [T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct. Kiefer-Stewart, supra.

Even if extreme misbehavior by a plaintiff could in some instances justify a conspiracy and refusal to deal and constitute a reasonable restraint, see, e. g., Ruddy Brook Clothes, Inc. v. British & Foreign Marine Ins. Co., 195 F.2d 86, 89 (7th Cir. 1952) (permitting concerted refusal to deal by defendant insurance companies with "fire-bug" plaintiff), the facts here fall far short of those involved in Ruddy Brook. Without such extreme circumstances, the doctrine of Kiefer-Stewart, supra, and Perma-Life Mufflers, supra (even though the latter involved in pari delicto and not unclean hands) applies.

◼ Defendants have also asserted that the Twenty-First Amendment bars plaintiff's suits. "That amendment bestowed upon the states broad regulatory power over the liquor traffic within their territories." United States v. Frankfort Distilleries, 324 U.S. 293, 299, 65 S.Ct. 661, 664, 89 L.Ed. 951 (1945) (footnote omitted). In these cases, however, the Sherman Act does not conflict with Maryland's regulatory scheme for alcohol. Defendants have directed this Court's attention to Md.Ann.Code Art. 2B, § 109. That section compels, inter alia, certain individual actions by Maryland liquor wholesalers. Nothing in its provisions, nor in all of Article 2B, permits wholesalers to conspire with retailers to fix retail prices, or makes difficult compliance with any provision of Maryland law without such conspiracy. Melrose Distillers, Inc. v. United States, 258 F.2d 726, 729 (4th Cir. 1958), aff'd, 359 U.S. 271, 79 S.Ct. 763, 3 L.Ed.2d 800 (1959); United States v. Maryland State Licensed Beverage Association, 138 F.Supp. 685, 693, 699 (D.Md.1956) rev'd on other grounds, 240 F.2d 420 (4th Cir. 1957). Whatever the potential breadth of state powers under the Twenty-First Amendment, the powers themselves provide no shelter for federal antitrust violators in a case in which the state (here the State of Maryland) has enacted no law which in any way has required, encouraged or suggested any acts in violation of the strong federal antitrust prohibition against price fixing.

* * * * * *

For the reasons set forth in this opinion, Schnapps is entitled to monetary damages in the Wright case, but not in the Universal case. To date, trial in these cases has been limited to liability. Trial as to damages in the Wright case will accordingly shortly be held. Accordingly, also, in the Universal case, judgment will be entered for Universal.

It is so ordered.